### ROSEN v. LLOVERAS et al. *
### No. 14365.

Court of Appeal of Louisiana. Orleans.
June 12, 1933.

J. A. Woodville, of New Orleans, for appellant.

Chas. F. Fletchinger, of New Orleans, for appellee Swift & Co.

HIGGINS, Judge.

This is a suit by a widow to recover damages for the death of her husband against the defendants in solido. The petition alleges that on December 14, 1931, about 4:30 a. m., while her husband was crossing St. Claude avenue at the corner of Pauger street, a truck owned by James Lloveras, and operated by John Johnson, without any warning, ran into the deceased, knocked him down, and ran over him, that after his body was lying in the street in plain view an automobile owned by defendant Swift & Co., Limited, and being driven at a rate of speed of forty-five miles per hour by its employee Leon C. Hupin ran over him, and that as a result of the injuries and shock inflicted upon the deceased by both vehicles he died in the Charity Hospital several hours later.

The case was compromised in so far as defendant James Lloveras was concerned for the sum of $750, and therefore no appearance was made in his behalf.

Defendant Swift & Co. for lack of sufficient information denied the allegations with reference to the deceased having been knocked down by the truck, denied that its Ford coupé automobile ran over the body of the deceased and averred that on December 14, 1931, at about 4:30 a. m., Mr. Hupin was driving its Ford car on St. Claude avenue

*Rehearing denied June 29, 1933.

in the direction of Canal street, and, after passing Pauger street, he noticed a truck, without lights, parked on St. Claude avenue near the sidewalk curbing; that, as he approached the truck, three negroes ran out from in front of it into the street and proceeded to wave and to hail him; that, "being suddenly confronted by their unusual conduct and not knowing whether their motives were good or otherwise, respondent's driver did not stop immediately, but upon going a short distance further and observing that another automobile had arrived at the scene, he stopped and went back to investigate; that on arriving at the location of the truck parked near the curb as aforesaid, he saw for the first time the form of a man lying in St. Claude Ave., parallel with the neutral ground, some fifty feet distant from the intersection of Pauger St., about opposite the truck; that at the time he approached the truck it was very dark and raining heavily; that the sudden emergence of the negroes into the lane of traffic, coupled with the yelling and gesticulating at him, distracted his attention at the time from the road immediately in front to the negroes who were seeking to intercept his passage and whose motives were then undetermined"; and prayed that plaintiff's suit be dismissed.

There was judgment dismissing the suit, and the plaintiff has appealed.

The three negroes who were riding on the truck, including the driver, testified in substance that they were driving on St. Claude avenue in the direction of Canal street; that St. Claude avenue is a paved thoroughfare with a neutral ground in the center on which are located street car tracks; that the riverside thoroughfare is used by traffic moving toward the Industrial Canal and the lake side roadway, about 20 feet wide, is for vehicles traveling in the direction of Canal street; that they were traveling between twelve and twenty miles per hour; that it was dark and a light rain was falling; that, after passing Pauger street for a distance about the length of the truck, the deceased stepped from the neutral ground directly into the path of the truck (however, one of these witnesses stated that the deceased was walking in the middle of the street with his back toward the truck at the time he was knocked down); that he was hurled a distance of about fifteen feet; that Johnson stopped the truck within three or four feet and then drove it to the right side of the street or sidewalk curbing and parked it at an angle of 45 degrees; that after parking the truck they noticed an automobile approaching at a very fast rate of speed and ran out into the street, waving and hollering at the driver in order to call his attention to the fact that the deceased was lying in the street, so that he would stop; that instead of stopping he accelerated his car and ran over the body of the deceased;

that, before the coupé automobile approached, the deceased was lying at an angle with his feet from two to four feet from the neutral ground curbing and his head in the direction of Canal street; and that after the wheels of the coupé struck the body it was more parallel to the curbing of the neutral ground.

Charles Parks, a night watchman, who was attracted to the scene of the accident by the yelling of the negroes, states that the truck was parked on an angle with its front toward the sidewalk and its rear toward the neutral ground, that the deceased was lying between the neutral ground curbing and the back of the truck in such a position that it was impossible for an automobile to pass without running over him, and that a taxicab going in the direction of Canal street was forced to turn back and use the riverside driveway of St. Claude avenue.

The only eyewitness for the defendant was Mr. Hupin, the driver of the Ford coupé. He states that he left the company's place of business at five minutes of four that morning and was driving on St. Claude avenue in the direction of Canal street at a speed of about fifteen miles per hour; that it was dark and raining; that when he was about ten feet past the intersection of Pauger street he noticed a truck parked against the sidewalk curbing without any lights; that when he got about twenty-five feet from the truck three negroes ran from in front of the truck and began to yell and wave their hands in the air, causing his attention to be directed towards the sidewalk; that "I didn't know whether they were figuring on holding me up or not"; that he continued on his way to the next corner which is St. Anthony street, and looked back, and, seeing that another automobile to the rear of his had stopped, he parked his car and walked back on the sidewalk and found the body of the deceased in the lakeside roadway which is thirty feet wide, about fifty feet from the corner of Pauger street, parallel to the neutral ground and about five feet from the neutral ground curbing; that he did not see the body of the deceased in the roadway while in his car, and did not feel any bump which would indicate that the wheels of the car had passed over an object in the road; that he advised the negroes to notify the police and call for the ambulance, which they had not done, and then departed.

The defendant also introduced in evidence the coroner's report, which states that the cause of death, as revealed by an autopsy, was "hemorrhage and shock following fracture of base of skull, compound fracture of the left tibia and fibula, laceration of scalp, contusion of right shoulder, laceration of right hand."

Defendant also introduced in evidence the Charity Hospital record showing the final

diagnosis as to the cause of death to be the same as that given in the coroner's report.

Defendant also placed Dr. Hiram Kostmayer on the stand for the purpose of giving expert testimony. In response to a hypothetical question to the effect that, if the body of the deceased was lying prone on the paved roadway, face down, and the wheels of a Ford coupé, running at a speed of fifteen miles per hour, passed over his head, would it cause a fracture of the base of the skull, the doctor stated that, since the X-ray pictures taken at the Charity Hospital showed that there was not any fracture to the vault or vertex or round part of the skull, he was of the opinion that the fracture of the base of the skull could not have been caused by the wheels of the coupé running over the deceased's head, unless the wheel struck at the point of the neck and dragged the body along the pavement before the wheel mounted and passed over.

In reply to another hypothetical question in substance that, if a 1½-ton truck, being driven at a speed of from twelve to fifteen miles an hour, suddenly and unexpectedly ran into the deceased with such force as to catapult him fifteen feet to the pavement, could that cause a fracture to the base of the skull, the doctor stated that it is just such accidents as described that usually cause a fracture of the base of the skull, which he further explained was the floor of the skull upon which the brain rested.

The doctor was also of the opinion that the compound fracture of the left tibia and fibula was not caused by the Ford car running over the legs of the deceased, but by the truck knocking him down and running over him.

The question of whether or not the driver of the truck was at fault in running down the deceased, who was 70 years of age, is no longer presented because of the settlement made by the plaintiff with the owner of the truck.

The remaining issue is whether or not the driver of the Ford coupé negligently ran over the old negro who was lying prostrate on the street.

Admitting that the wheels of the Ford coupé passed over either the head or legs of the deceased, or both of them, a view most favorable to the plaintiff, she has not offered any evidence which would tend to show that the fatal injuries had not been previously inflicted upon the deceased by the truck. The fact that all of the witnesses state that the deceased was lying unconscious in a helpless condition in the roadway, after being struck by the truck, would indicate that he had been seriously hurt by the truck.

The testimony of Dr. Kostmayer, as an expert, tends to show that it is quite unlikely that the fatal injuries suffered by deceased could have been sustained as a result of the wheels of the coupé passing over him.

It appears to us that the kind of injuries which the deceased sustained would more probably have been the consequence of the heavy truck suddenly and unexpectedly knocking him to the pavement in the violent manner, which the witnesses for the plaintiff described, and running over him, rather than the result of the lighter Ford coupé running over the deceased as he lay prone on the pavement.

However, further conceding that the deceased was run over and that some of the fatal injuries resulted from coming in contact with the wheels of the Ford car, we pass to a consideration of the defense of sudden emergency, which was specially pleaded by the defendant.

The evidence unquestionably establishes the fact that the attention of the driver of the coupé was suddenly arrested and directed toward the sidewalk, or his right, by the actions of the negroes. In deciding the issue, the trial court said: "Hupin, with a Swift machine, was coming up in the dark night, raining, with no reason shown for speed and every reason shown against speed, and when he swears that he was traveling approximately fifteen miles an hour I believe him. And I believe him when he says that he had reached and crossed Pauger Street when the negroes rushed from their truck, yelling to him to stop. Naturally his attention was attracted to the negroes, and in these days of holdups the first idea that would come into his head, and probably would have come into mine, was an attempted holdup, so instead of stopping, he was justified in my opinion in increasing his speed."

We believe that the evidence supports the conclusions of the trial judge that the conduct of these parties was such as to create in the mind of a reasonably prudent person an apprehension of imminent danger. Under the law, one suddenly confronted with an emergency is not held to the exercise of the presence of mind and judgment required of one apprehending danger with sufficient time to realize and avoid it. See Martin v. Cazedessus, 15 La. App. 100, 130 So. 129; Hunt v. Jones, 14 La. App. 520, 130 So. 138; Buckner v. Powers, 12 La. App. 630, 125 So. 744.

Finally, counsel for plaintiff contends that the sudden emergency rule has no application because the driver of defendant's car, by the exercise of ordinary care, could have discovered the presence of the deceased lying in the road before the negroes ran out from the sidewalk, and therefore his own negligence in not keeping a proper lookout contributed to cause the dangerous situation. We are unable to agree with counsel because the body was about 50 feet from the intersection, a place where a driver would not anticipate the presence of a pedestrian, and it was dark and raining, which tended to ob-

scure the driver's view, and just when he was coming within a range from which the body could be seen, his attention was distracted by the negroes suddenly running out, waving and hollering.

We conclude that the judgment of the trial court is correct, and it is therefore affirmed.

Affirmed.